16-F-0664, people of the state of Illinois, plaintiff's affidavit, v. John T. Rushing, defendant of counsel, arguing on behalf of the defendant of counsel, Ms. Phyllis J. Perko, arguing on behalf of the plaintiff's affidavit, Mr. Edward Randolph Simon. Ms. Perko, you may proceed. Good morning. May it please the Court, John Rushing appeals from his misdemeanor convictions for domestic battery and interfering with the reporting of domestic violence. Our sole argument on appeal is that the proof is insufficient to sustain the convictions beyond a reasonable doubt. The brief underlying facts that control the issue in this case are that the complaining witness and Mr. Rushing were living together in a motel room at the time in question. And in the middle of the night, essentially, the complainant awoke or came to to discover that she had been suffering from fairly significant facial injuries. She testified that she was unaware that these injuries were inflicted or that she suffered these injuries. She did not feel anything when the injuries were inflicted. And she nevertheless believed that Mr. Rushing had beaten her. And essentially, her subjective belief in this regard rested on the fact that she found him to be angry and scary both before and after she discovered her injuries. Well, there was her testimony, as I recall, about after the injury as she woke up or came to was something like she remembered him saying you had it coming or something of that nature. Correct. And wouldn't that indicate that he either was there when it happened or that he had, in fact, accomplished the task? Well, it could indicate that he was present. There is that possibility. But it doesn't exclude the possibility that other people were present. And it does not, in the context of all the evidence, that isolated comment does not establish that only the complainant and he were present. We certainly would acknowledge that if the evidence proved beyond a reasonable doubt that both the complainant and Mr. Rushing were alone at all times on the evening in question before and after the injuries, but most precisely before the injuries and at the time the injuries occurred, that I would be arguing a different case than I'm arguing this morning. But that issue of the presence of Mr. Rushing in the room at the time that the complainant incurred her injuries, that question is a crucial question. And it is essential to the state's proof in the case at bar. Were there some threats or comments about using the phone? There was a comment that she testified to, to the effect that if she attempted to contact the police, that he would make, that he, Mr. Rushing, would make it worse for her. Yes, that comment exists in the record. And so it's our position, so I'll acknowledge first the evidence that is, let's say, the strongest against us. And the one I have spoken about, and that would be whether or not he was present in the room, that's crucial to the state's case. That is, that cannot be proven. It was not proven, because the only, in the circumstances of who testified at trial, and essentially there were three witnesses at trial, the complainant and two police officers, and the police officers had no knowledge of what may have happened in that room that night, except insofar as they were informed by the complainant. And so, I mean, their testimony is simply not probative of what may have happened in the room and who, specifically, who was present in the room. But it is true that the other potential evidence he has against Mr. Rushing that could have some strength would be his statements. But there are probably three statements in question. And one statement occurred, there were statements that he made, or an interchange, before the complainant discovered her injuries. And that interchange, according to the complainant, made her believe that Mr. Rushing was angry, and it made her feel that he was scary. That may be true. She did testify that threats were made in this interchange before she discovered her injuries. But, however, she does not describe what those threats may have been. And that gets to the problem of the complainant's testimony in general, which is that it is very sketchy, and it is not sufficiently strong to convey the concept and the story of what happened on the night in question. With regard to the statements made by Mr. Rushing, as to the statements both before she discovered her injuries and after she discovered her injuries, she clearly testified that she did not remember everything that was said. And if you read those portions of the record in which she testifies to these statements, you will see how barren, sketchy, vague, and uncertain her testimony is about what was happening. Could a jury believe that since we don't have evidence that she had a broken leg or a broken arm, I think the most extreme, the extremity that was injured, she said her hands hurt, but we don't have any other significant injuries other than head. Couldn't the jury assume that this sketchy testimony, as you describe it, has something to do with either what she admitted they had been doing, a concept, the discussion about a dirty needle, and the fact that she had head injuries? Well, that may be. Or any of the above put together. But the fact that the sketchiness of the testimony may have been caused by, let's say, the presumed or assumed beating that she suffered, that fact does not excuse a failure of the evidence to meet the reasonable doubts. I mean, we frequently have victims who, unfortunately, are the victims of homicide. Clearly, they cannot speak to their situation, just as this witness was unable to speak to her situation. This is a very special circumstance where the complainant says that she was totally unaware at the time she incurred her injuries. Neither the state nor the defense has been able to find a single similar case. There are two somewhat similar cases in the state of Illinois, the Gray case from the Supreme Court and the Jen case from the First District of the Appellate Court, that do deal with the problem of an unconscious victim. But, however, in both of those cases, the victims were aware up to and including the time that they received initial assaulted battery from the defendants. So that in the Gray case, the defendant, excuse me, the complainant was being strangled by the defendant and didn't actually see a knife in his hand and so forth and so on. So that she was aware. But she saw it afterwards. I mean, she didn't see it before, she saw it afterwards, I thought, when he was in the bathroom and she saw blood. That's true about the knife. It's not true about the strangulation. No, no, no, I know that. But we're talking about befores and afters here as well. Well, correct. But we can talk about the totality of the evidence. Well, if the evidence in that case is to be believed, she didn't even know she was stabbed in the back until her daughter took her coat off. That part is true. I mean, she knew she was bleeding from the front somehow. That part is true, but one looks at the entire strength of the circumstantial evidence in that case. And in that particular case, the defendant admitted that he had cut her with a knife but defended on the basis of self-defense. So that we submit that it is crucial to the holdings in those cases that the complainants knew that they had suffered assaultive battery from the defendants in those cases. We don't have that situation in the case of ours. I am not trying to argue that there must be that type of circumstance. But one has to look at the particularly strong evidence that was present in Gray and Jenk to sustain those convictions. And that particularly strong evidence was the knowledge of the assaultive battery that we've already discussed. And the other factor is that there was propensity evidence, prior acts of abuse in both of those cases. Our case this morning essentially negates the possibility of that type of propensity or prior conduct. Since the evidence shows that the complainant said to Mr. Rushing, according to her own testimony, I never thought that you would have done this to me. So you don't have that, and there's yet a third type of evidence in Gray and Jenk. And it has to do with the admission of guilt. So in Gray, as already mentioned, the defendant admitted that he had had the knife and was using it, but claimed he was using it in self-defense. In Jenk, the defendant, along with the complainant, concocted a story for purposes of telling the police and the medical personnel at the hospital what had happened to the victim and why she had these injuries. So you have a very clear acknowledgment of guilt. You look at that very clear acknowledgment of guilt, which has to do with the strength of the circumstantial evidence in those cases, as opposed to these disjointed statements supposedly made by Mr. Rushing, which statements could as well have referred to a battery having been perpetrated by a third party. So that these statements were, you had it coming to you, not I did this to you, and not in context of why this really happened. There's no... But you had it coming to you occurred after the conversation about you touched me and you might have poked me with a dirty needle. Correct. That particular discussion is pretty much where this story opens, with her saying we're in the motel and this is the first thing that happened. That night I went to sleep, he woke me up, and he was angry and started talking about dirty needles, and I was afraid. And then I fell asleep again or became unconscious again or whatever. And during this period of my unconsciousness, I suffered injuries, and then I woke up and discovered I had these injuries, and that's how I know that they happened, because I have them, but not for any other reason. And then these other statements happened, and these other statements are essentially you had it coming to you, and I won't make it worse for you if you contact the police. What about him just, well, at least according to the police who arrived and he wasn't there, and the complainant who said she again woke up or got cold and turned over and the door was open? Well, he wasn't there. I mean, what about his absence? Is that any, we always say fleeing has some inference or evidence of guilt. I mean, are we looking at that at all, or should we look at that at all? Well, no, we shouldn't look at that, because it's simply not evidence of fleeing. It is evidence of one thing, that he was no longer present in the room. We don't know when he left. We really don't even know the time period between her last period of consciousness and her discovering that the door was open. So there simply isn't any evidence about why he left. She doesn't know why he left. She doesn't know when he left.  She doesn't know who opened the door. There's not a very clear chronology. I mean, I tended in my brief to look at it as approximate times where there were two-hour periods. But if you look and read her testimony, you will see probably that that was established by leading questions from the prosecutor so that, you know, the clarity of what happened that night comes not so much out of her mouth as it does out of a reconstruction. And I realize that my time is up. We're done. But I just want to stress that although there are reasons to suspect Mr. Rushing's responsibility for this crime, the cases that we've cited, ALERT essentially relying on the Smith case, make clear that a probability of even a probability of responsibility, as stated by Justice Freeman in ALERT, even a probability of responsibility does not meet the reasonable doubt standard. And we submit to the Court that there's no more than suspicion in this case and that the proof was not sufficient to meet the reasonable doubt standard. And we therefore request reversal of these convictions. Thank you. We'll have an opportunity to make revisions. Thank you, Your Honor. Mr. Seneca, you may proceed. Good morning, Your Honors. My name is Randy Seneca. I'm an Assistant State's Attorney in the DuPage County State's Attorney's Office. And as always, it's my pleasure to argue on behalf of the people of the State of Illinois. This case comes before you, Your Honors, on one of the most onerous standards for a criminal defendant. It's the Collins standard, wherein this Court is asked to judge whether any rational fact finder could have found the essential elements of the crime beyond reasonable doubt. In undertaking this task, Your Honors are directed to view the evidence in the light most favorable to the people. What evidence is there that she didn't do it herself? Or that she fell out of the bed and smashed her head on the floor? Well, the evidence included that the defendant told her that she had it coming, that he would make it worse if she called the police. Why would he do that unless he perpetrated the injuries himself? The evidence also included that he had in his mind at least one motive. Well, at least to attempt to negate the idea that she did it herself, because otherwise there's no rhyme or reason to his commentary if she was the one who either planted her face or she ran into a wall. Right, and the extent of her injuries... Okay, now, let's assume that maybe there's another possibility, and that is that a third party, other than the defendant, committed the crime. What evidence did the State present to suggest that that didn't happen? Her uncontradicted testimony to the victim was that they were alone in the room before and after the accident, and they had been in the hotel room for about a month, and they had never been with a third party in that hotel room. Had they been having a party at some point, and there were other potential defendants around that might have perpetrated this injury, Your Honor might have a point. But the uncontradicted evidence before the jury, the trier of fact, was that they were alone both before and after, and a third party had never been in the room with them. Your Honor, what was the time frame that was established between her first consciousness and her second consciousness? It was a matter of an hour or two, I believe, Your Honor. It was very late at night. Again, regarding reasonable inferences, which we can rely on based on the facts, the uncontradicted, salient facts was that if he's present in the hotel room, does he stand idly by while his... Was it a motel or a hotel? It's a motel. Does he stand idly by while his paramour is being beaten by some third party? I mean, he was there. He was there. He said she had it coming. Maybe he's in the state office. Entirely possible, but not part of the record. So... What about the... I believe there was some fact that indicated that two cell phones were wrapped up in a towel. Right, right. What does that imply or infer or establish? That actually supports her testimony, the victim's testimony, that he said he would call the police. If she called the police, he would make it worse. It's evidence that he was affirmatively preventing her from calling the police. And why would you do that unless you battered the victim? Well, we don't know that he necessarily was the one that hit the phones, but you might infer that since he suggested that, that as some complementary or supplementary activity that might be the logical result of his suggestion that she should call the police. That she should call the police. And again, Your Honor, I would go back to the fact that there's absolutely no evidence that there was at any point someone present in this room. So if someone hit the phones, wrapped them in a towel, the only reasonable inference is that he did it. And that testimony was uncontradicted. My opposing counsel made a big deal about the believability of this victim. About her sketchy recounting of events. The salient details that the jury relied on weren't contradicted and were not sketchy. She affirmatively said he told her he would make it worse if she called the police. He affirmatively said. That could be a threat to the future. It doesn't necessarily mean he made it bad in the first place. Does it? Well, saying I'm going to make it worse and donning leather gloves and making fists at the victim, that's all it can mean, Your Honor. That's the only reasonable inference. Opposing counsel says that there's no admission on this record that he did it. That's an admission. That's as close you can get to saying I did it without actually saying I did it. I'm going to make it worse. You had it coming. That's the exact fact that the court relied on in Jake for another unconscious defendant to conclude that the defendant had perpetrated the battery. You had it coming. That means I did it. I mean, it can't be the case. It can't be the case that the jury's not allowed to rely on reasonable inferences. And the only reasonable inference, the inescapable inference, as I said in my brief, is that this victim was battered by the defendant. I mean, I appreciate the efforts opposing counsel has made into putting together an argument here, but I mean, and she was left with this record by defense counsel. Defense counsel took the untenable position, both in the motion for the directed finding and the closing argument, that the victim was affirmatively lying, that she was making this stuff up, but then did not present the court in the motion for a directed finding or the jury in the closing argument some motivation for her to lie. I mean, the better tactic would have been to take, well, what opposing counsel has done here and said her memory was cloudy, she admitted her memory was cloudy, and we all know why her memory was cloudy. You saw that, or you will see if you haven't seen the pictures yet, the extent of her injuries. What does the statement, you stuck me with a dirty needle, imply? That he believed, at least in his own mind, that he had a reason to seek revenge against. Well, does it also mean that drugs were involved? I believe that's a fair inference, but certainly no drugs were spoken about at trial. There's no evidence of drug use, but I don't think we're talking about diabetes needles either. No instruction as to habitual drug use or addiction or anything? No, no, Your Honor. Are we talking about a subcutaneous needle or something used to sew things? We don't know. We just have the solitary phrase. So there was no drug paraphernalia ever found on premise? Not that I'm aware of, Your Honor. I don't remember there being a reference to anything in evidence inventory, certainly not admitted at trial, that the trial de facto have concerned themselves with. By their nature, I have not engaged in any contact sports where injuries occur. How exactly does one get injured as badly as the complainant did and have no knowledge that it occurred until she either woke up and looked in a mirror? Well, there's no question she lost consciousness based on her testimony. She said that or she acknowledged saying that she was asleep when she was running unconscious. So she's a small woman. A direct blow to the head, could that knock you unconscious, the first blow? I mean, that's another problem the defense counsel had below. He said it was physically impossible for that to happen without presenting any evidence of such. Have you ever watched YouTube? I try not to. My children do. There are videos on YouTube where people get cold cocked, blindsided, and get knocked down. And I don't know how they could have seen it coming because it came from behind them and the person swung around and actually hit them in the front of the face, right side of the face. I'm not trying to quote YouTubers taking judicial notice of it, but you can be struck in a way in which you aren't aware and you're rendered unconscious. And I believe that's what happened in Jake. I believe the victim didn't see the blow coming, but she was rendered unconscious by the blow. She knew the defendant was in the room at that time, just as our defendant did. But she recognized there was a blow. Well, she remembered being struck by a blow. And you have to remember, our victim's in bed. She's got her eyes closed. She's not asleep. It's very late in the evening. You're saying if she was lying on the bed or sitting on the bed with her eyes closed, she could have been struck and she wouldn't know what happened. Right. She could have been struck with an object. I mean, she doesn't remember what happened. Right. And the key point about that, Justice McClaren, is she's very candid about the fact that during the initial moments after the injury, she had trouble piecing together exactly the events of that night. But as time goes on, she's able to remember. That was her testimony. I mean, that's the sketchiness that defense counsel refers to. And I don't believe that's sketchiness. I think that's being candid. Have you ever heard the term retrograde amnesia? I have. What does it mean to you? That it's like a bit of retro, a bit of amnesia that it starts to improve over time, that things, you know. Why don't you enlighten me, Your Honor? I wrote a case called Alcorn v. Stepsinski back early on in my career. And it related to a woman that fell down a flight of stairs and had retrograde amnesia and couldn't remember how it happened. And she lost at the summary judgment stage because she couldn't testify what happened. And as the opinion said, these stairs were just stairs, so they weren't inherently dangerous. So there is such a thing called retrograde amnesia, which could establish the fact that the mere injury causes a loss of memory such that there may be people who were conscious, who were struck, who can't remember what happened, let alone have their eyes closed or be asleep. Sure. And to your earlier point, Your Honor, what evidence that she could have done this to herself, I mean, the testimony was she was in bed. Falling on a bed is not going to dislocate your jaw, fracture your cheek, blind you in one eye. I mean, we're talking about a princess in a pea bed. We're talking about a bed, you know, floors above the ground. So unless there are any other questions, if people would ask, Your Honor, we'll start from the judgment of the court below. Thank you. Ms. Burkham. Just one or two comments. The State repeatedly, and it's been again this morning, raises the questions of why would Mr. Rushing do something if he weren't guilty. Well, while it's fine to raise questions like that, it would have to be realized that the only way that question could be answered would be if Mr. Rushing had taken the stand and explained it himself. That being something that he clearly had no duty to do. And it really, in my opinion, strikes at the core of what reasonable doubt means as applied to this case. And when you come to the situation where there are unanswered questions in the proof and the only way those questions could have been answered is by the defendant having taken the stand, then you know that the prosecution failed to meet its burden to prove the case beyond a reasonable doubt. It is absolutely crucial to the State's case. And it's clear from the brief and it's clear from the argument this morning that the State needed to establish that there were only two people in this room at the time those injuries occurred. And the State absolutely did not prove that. And with the only witness having been the complainant and Mr. Rushing and the complainant's memory being what it was, the State simply could not ever have proved that with this witness's testimony. It is an unfortunate situation that the complainant suffers memory loss. It is particularly more unfortunate if her faulty memory is the result of criminal agency and particularly the agency of Mr. Rushing, who has stood in judgment in the trial court and now stands again for judgment by this court. But it does not relieve the State of the burden that it has. A couple of other loose ends. Justice McLaren questioned about the phones being found in the towels. I would submit, first of all, that since the complainant's testimony is so unclear about exactly how she had stored or left the phones in the first place, that there's really not a connection to Mr. Rushing having done this. But wasn't there some evidence that there was a phone near the bed when she woke up that will say, according to your timeline, about 4 o'clock? I think that there is one brief sentence in the testimony that indicates that. But there isn't later, correct? That's correct. But the ultimate point about the phones in the towel, even if you assume that Mr. Rushing put them there, it tends to be strong evidence for an element of interfering with the reporting of domestic violence. But it doesn't cure the problem that in order to be guilty of the offense of interfering with the reporting of domestic violence, you have to have first been the party who committed the domestic violence. And that's what is an issue before this court. Wouldn't it also lend itself, if I'm sitting back in the jury room and talking about this case, as I assume the jury did, is there any reason for him to hide the phones if he isn't guilty of some activity that would be criminal? Well, there can be. And, I mean, when we're talking about criminality, I mean, the criminality that's in question is a battery or not a battery. But there has been a lot of discussion, particularly with State's counsel this morning, regarding the likelihood, probability, or strong suspicion, suggestion that there was drug activity going on. So with that particular suspicion, hiding the phones becomes a lot more unclear. It becomes quite unclear as to whether hiding the phones may have been with reference to this occurrence that Mr. Rushing's been convicted of, or whether it's some other extraneous activity that the complainant or Mr. Rushing may have been involved in. All right. Although you said you weren't arguing the fact that the other cases, Gray, Ellert, Jenks, and I think there's one more, Thompson maybe? Thompson. It's about a 1970 case, yes. That you're saying that there has, based upon those cases, there has to be something in a record to establish a connection, so to speak. Aren't you actually arguing, though, if there is nothing and the person is so severely injured or impaired by what's happened, the criminal is just going to walk and we're never going to get him? You're discouraging prosecution in these cases and trying to accomplish justice in these cases. Well, I don't think that it discourages prosecution. It does point up a particular difficulty with offenses of domestic violence or any other kind of situation where there are not likely to be other witnesses. But the ultimate point here is that when there is one witness and only one witness. Which is permissible. And that's permissible. But when that witness's recollection is so faulty or that witness is so impeached, the testimony, the evidence given by that witness cannot meet the reasonable doubt standard. And the reasonable doubt standard, being as constitutionally mandated and enshrined as it is, we would submit will always win over the interests of the prosecution because their personal constitutional right is the preeminent principle. Thank you. This reason we ask for reversal. Thank you, Your Honor. Thank you. We'll take the case under advisement.  We have other cases on the call.